### FRIEDRICH v. SELIGMANN et al.
### (No. 8275.)

Court of Civil Appeals of Texas. San Antonio. Nov. 20, 1929.

Rehearing Denied Dec. 21, 1929.

Templeton, Brooks, Napier & Brown, of San Antonio, for appellant.

Birkhead, Lang & Beckmann and Harold K. Stanard, all of San Antonio, for appellees.

FLY, C. J. This suit was instituted by Albert Friedrich against Julius Seligmann, Joseph Rubin, and Joseph Freeman, to recover earnest money in the sum of $5,000, which had been deposited by him on a contract of sale between the parties, in connection with three lots of land in the city of San Antonio. The court, after hearing the testimony, instructed a verdict for appellees. Pending the suit Albert Friedrich died and his executrix was made a party.

The facts show on April 28, 1926, a contract for the sale of three lots in San Antonio, for the sum of $57,500, of which $22,500 was to be paid in cash, the earnest money of $5,-000 to be considered as part of the cash contracted for. The lots were described in the contract as lots 1, 2, and 3, in block 19, city block 976, on the west side of Broadway, formerly River avenue; lot No. 1 being described as a corner lot on the north side of Grayson street. The dates of payment of the balance remaining after payment of the cash were fixed, and the notes to be executed for each lot described. It is provided in the contract: "The said owners are to furnish to said Friedrich complete abstracts of title brought down to date, and said Friedrich shall have 15 clear days from April 29, 1926, in which to have his attorneys T. T. VanderHoeven and B. A. Greathouse, or either of them, to pass on said abstracts of title. If the title to said three lots of land is a merchantable title, then said Friedrich shall pay to said owners the cash consideration of $22,500.00, of which amount, however, said Friedrich has paid to said owners upon the execution and delivery of this contract of sale $5,000.00 in money, and therefore he is to pay the balance of $17,500.00 when the title to said lots is pronounced merchantable by his attorneys and the deal is closed. If the title to the property is merchantable and said Friedrich refuses to consummate the deal, then he shall forfeit said $5,000.00 cash payment as liquidated damages; but if said title to said three lots of land is not merchantable and is rejected by his said attorneys, then the said owners shall refund to said Friedrich the aforesaid $5,000.00 cash payment now made to bind said sale."

It was provided that each lot should be incumbered with no purchase money except that specified as being held against said lot, and further: "It is understood and agreed that said Friedrich has bought all three of said lots and unless the title to all three of said lots proves good and merchantable, then the said Friedrich shall not be required to accept any one of the three lots to which the title may be merchantable." The final clause of the contract provides: "It is further understood and agreed that the attorneys of said Friedrich shall point any and all defects they might find in said title in order to enable the owners to correct the same, which defects shall be corrected by said owners within thirty days from receipt of the opinion of said attorneys, and the failure to make such corrections shall avoid this contract of sale and said $5,000.00 earnest money shall be refunded to said Friedrich."

It is clearly indicated in the contract that the abstract of title was to show a good, merchantable title to each of the three lots, that is, a title fairly deducible from the record, and, being contracted for on an abstract of title, the purchaser was under no obligation to go outside of the abstract furnished him by his vendor, but should rest upon the abstract alone without reference to any extraneous matters. Maupin, Marketable Title of Real Estate, § 6, pp. 23, 24 and 25. As said by this court, through Judge Neill, in Bowles v. Umberson, 101 S. W. 842, 844, in discussing the use and scope of an abstract of title: "By or through what means is the title to be 'found good'? Clearly by means of the 'abstract of title to be furnished in ample time for the party of the second part to have the same examined within 30 days from the date of the agreement.'"

It is the rule that the vendor cannot resort to parol evidence to remove doubts as to the title, if he is acting under a contract to furnish his vendee an abstract showing good, marketable title, but the abstract must be sufficient unto itself to show that the title is marketable. The rule above stated may be subject to the exception that under certain peculiar circumstances parol proof may be used to establish the identity of a vendor along the line of title, or to establish relationship and heirship. Such parol proof is permitted because it would be impossible to establish those matters except by parol. That is in effect held in the case of Hollifield v. Landrum, 31 Tex. Civ. App. 187, 71 S. W. 979, which is relied on by appellees. In that case a patent to land had been issued to Levi Hildebrandt and he went into possession. A deed to the land was made by O. L. Hildebrandt to Ward, and it was the contention of the intending purchaser, who rejected the title, that the vendor could not show by parol that Levi Hildebrandt was identical with O. L. Hildebrandt, which contention was properly overruled by the Court of Civil Appeals. There are expressions about a title by limitation not called for by the facts of the case, and consequently mere obiter dictum. No decision, or utterance by any author of law books has been cited, which has held or stated that if the deeds shown in the abstract fail to connect the vendors with the sovereignty of the soil such hiatus can be supplied by parol testimony.

In this case the abstract of title showed a grant of "suerte" No. 6, to Juan Martinez, and from Martinez to Antonio Rodriguez Baca. There was a deed to "a suerte of land and 12 hours of waters, bounded East by the Madre ditch; north by suerte of Mariano Salinas; west by the river; and south

by Pascual Martinez." At the bottom of the instrument it is stated probably Alcalde Vicente Flores "did not sign because he did not know how." According to the abstract, about the year 1812, Antonio Baca was declared a rebel and his lands confiscated by the Spanish government, along with that of many other insurgents. On September 10, 1819, a list of confiscated properties was made by the authorities, from which the following extract is made: "Antonio Baca, 5 suerte which is rented for 6 bushels of corn." Some one, probably the person who prepared the abstract, has volunteered the hypothesis: "The probability is that the lands were restored to his widow, Maria Gertrudes de los Santos Coy, for she disposes of them by deed or will."

The will of Gertrudes de los Santos Coy declares that "she was first married to Antonio Rodriguez Baca (from which marriage there was no succession)." She declares in said will that her property consists of "two suertes of land in the upper labor of the Alamo with 24 hours of water." The balance of the will in any manner affecting property is as follows:

"4th. Declares that in front of my house, on the other bank of the ———— I have a piece of land bounded North and East by lands of Manuel Ximenes; and West and South by the River, which I leave to Ana Maria and her children.

"5th. Declare that I leave at the end of the labor de los Mochos a suerte of land with 12 hours of water for the benefit of my husband's, my mother's and my daughter's souls that with the annual interest thereof masses will be held, and if sold, the value thereof shall be left for masses of the aforesaid souls.

"6th. Declare that excepting 41 varas of land which I sold to Monjaras the balance left up to Alamo Bridge on the East and from same Street North to the River is mine.

"7th. Declare that on the other side of the Street which run to the Alamo Bridge and from in front of the land of Monjaras to where a hackberry tree stands above River dam I have sold to Pedro Salinas at $2.00 per vara of which sum I have only received $24.50.

"8th. Declare as my property the house in which I live, composed of three rooms and an adobe kitchen; of these rooms it is my will that the room and part of the rear building East with depth to the River, remain for the benefit of Ana Maria and her children.

"9th. Declare that 6½ varas from corner of the room are mine and I leave it for the benefit of Maria Josefa Salazar.

"10th. Declare that my adopted son Pablo Baca and his wife Ma Josefa use the house in which they live for life or until he remarries (without selling it) or if she dies or remarries, said house shall remain for the benefit of Antonio.

"11th. Declare that I have a piece of land lying between the house of Pedro Monjaras and the land that I sold to Pedro Salinas.

"12th. Declare that jacal in which Ma. Antonio lives and land fronting on street to corner of the jacal with depth to the River, also the land on which stands the kitchen of Manuel Monjaras is mine. I leave it for the benefit of Ma. Antonia."

"17th. Declare that I leave as my only heir my grandson Jose Antonio Flores of all that is left after my will is complied with."

"19th. Declare that after my death it is my will that a Guardian be named for my grandson, Jose Antonio Flores, Refugio de la Garza shall appoint said Guardian."

The next in line in the abstract is a deed from Jose Antonio Flores, describing himself as heir of the maker of the will, conveying to Jose Antonio de la Garza "one suerte of land with 12 hours water situated in the labor of Valero and known by the name of Alamito. * * * Said suerte is bounded north by lands of purchaser; west by the river of this city; south by lands of Manuel Ximenes, and east by Madre ditch of said labor."

The next link in the title was two deeds dated December 5, 1847, conveying by Jose Antonio de la Garza to James L. Trueheart a tract of land in Bexar county, making a reference to a plat which does not aid the description. No reference is made in the deed to suerte 6, the only mention of a suerte being that the tract was bounded on the south "by a suerte of land belonging to the heirs of Manuel Ximenes and beginning at a post on the West bank of the Acequia Madre or main ditch, the upper corner of said suerte and about ¾ of a mile above the Alamo Fort." James L. Trueheart, on December 4, 1871, conveyed to Robert Leslie 13¾ acres of land in San Antonio situated between the Alamo ditch and San Antonio river, bounded on the north by land of Leonardo Garza, on the east by Alamo ditch, on the south by land of John James, and on the west by a drain running through irrigable lands and the land of the said Leonardo Garza. The land described was reconveyed to Trueheart by the executors of John Leslie, deceased, to pay the purchase money, on April 10, 1880. The property through different conveyances came to appellees. None of the conveyances mentioned suerte 6; the first and only time it was mentioned being in the grant from Spain. There were several maps or plats attached to the abstract after objections had been made by Mr. VanderHoeven. The one adopted by the city on February 19, 1878, does not indicate that the land was a part of suerte 6, although there are placed in it certain words and descriptions, which were admitted to be no part of the map, but which are calculated to mislead. There is nothing to show the location of suerte 6, except a plat or map made by the Texas Title Company "from

data in recorded deeds, etc.," showing *approximate* location of original suerte lines of the Valero labors. There was no data given in the deeds upon which to base the location of suerte 6, "approximate" or otherwise.

■ There is no basis for a contention about limitation, for there is no proof that any one has ever been in possession of suerte 6, or lots 1, 2, and 3, for any statutory period, and while the grant of Spain may be hoary with age, possession under that grant is absolutely essential in order to perfect a title by limitation. If it be the law, as contended by appellees, that an abstract showing a title by limitations would have met the contract, it can be said that no abstract showing such title was ever tendered by appellees to Friedrich. In all the cases cited by appellees, possession always accompanies the assertion that a title can be perfected by time so as to meet the requirement of a marketable title. As said in 57 A. L. R. 1526, relied on by appellees: "But even where a title by adverse possession cannot be relied upon to comply with a contract to furnish a good or marketable title, it seems that lapse of time may be relied upon to cure defects in the vendor's title. Without holding that title by adverse possession had been established it has been held that defects in the vendor's title were not available to the vendee as an objection to performing the contract, where the vendor and his predecessors in title had been in undisturbed and undisputed possession of the subject-matter of the contract for a long period of time; at least, where it is made to appear that possession was held under a claim of title under the defective instrument, exclusive of all other rights." While that latitudinarian opinion in a number of its statements cannot be indorsed, still it gives no aid or comfort to the claim of appellees that time has perfected their title. Possession is made the basic matter in that opinion, and appellees have not shown possession.

■ It is asserted by appellees that "there is nothing to show that the grant of suerte 6 to Martinez did not include the lots in question." That can with propriety be said of any other Spanish grant in San Antonio. The trouble is that neither the grant nor the deeds, for over 50 years, in any way indicated that the lands conveyed were a part of suerte 6. A purchaser of land may voluntarily exercise faith in a title not traceable to the sovereignty of the soil and never shown to have been in adverse possession of any one, but the law cannot and will not endeavor to force said faith upon him under a contract requiring an abstract of title showing a good, marketable title. Friedrich could have shown a blind faith in the title, defective though it was, to the three lots; but he and his attorney had no such faith, and a court by its decree cannot supply that faith and simple trust.

In preference to the latitudinarian language used in quotations by appellees from several courts as to abstracts of title, which we deem not well supported by authority, we prefer the following language from the highly respected Court of Civil Appeals at Texarkana, in the case of Wright v. Glass, 174 S. W. 717, 718: "Contracting, as the parties did, for an abstract of the title to the land, and that it should be sent to an attorney of the purchaser for examination, comprehends the purpose of the parties that the abstract exhibited should be subject to reasonable examination and approval by the purchaser. A provision that the abstract should be first sent to an attorney 'for examination' would be meaningless unless construed as words intended to be appropriate to a condition that if after reasonable examination by the attorney the abstract exhibited failed to show a good title in the vendor, the purchaser was not then bound to consummate the purchase and should not forfeit his earnest money. There would be no necessity for an 'abstract to the land' unless it was for the purpose of exhibiting a record title. As ordinarily used and understood 'an abstract' is simply a compilation in abridged form of the record of the title. In this meaning of the term, as commonly understood, such construction of the contract should be adopted as would require an abstract showing a good record title. Anything less than this would not satisfy the term and carry out the implied intention of the parties. The terms used by the parties exclude, it is thought, any expectation on the part of the purchaser that there would be offered to him a title by limitation, depending, as it does, upon facts outside of and independent of the records. In the absence of adjudication in some way, a title by limitation is not settled. Had the abstract as exhibited been subject only to the objection that it was not free from incumbrance or cloud, it may have been, as contended by appellee, that he had within the meaning of the contract tendered a marketable title. And appellee might have a title by limitation such as would constitute a good title in law, but the terms of the contract here do not include or contemplate such character of title." The contract in that case as to an abstract of title is not near so clear or so conclusive as to the abstract of title and the opinion of the attorney in this case.

■ By no fair deduction from the words of the contract can it be inferred that appellant would be forced into a trial on the question of limitations and to locate the land granted by the sovereign and to show appellees' connection with the grant, outside of the record and the abstract thereof. The provision as to submitting the abstract of title to the attorneys of appellant for examination and conditioning the obligation to take the land upon the opinion of the attorneys becomes meaningless and sense-less, if in spite of that opinion, not shown

to have been unreasonable, captious, or given with improper designs, appellant should be compelled to pay for the land or lose $5,000 earnest money. As said by Maupin, in his Marketable Titles (2d Ed.) pp. 725 and 726, § 288: "An agreement that the title shall be satisfactory to the purchaser's attorney will justify the purchaser in rescinding the contract if the attorney in good faith, and not capriciously, declare himself dissatisfied with the title." It was contracted that "complete abstracts of title brought down to date" should be furnished Friedrich, and that his attorneys T. T. VanderHoeven and B. A. Greathouse, or either of them, should have 15 days in which to consider them. The question of merchantable title was to be decided by them, and upon that decision, given in fairness and without injustice or caprice, the sale depended. It was in plain language made to depend on "when the title to said lots is pronounced merchantable by his attorneys and the deal is closed." The title to said land was "not merchantable and was rejected by his said attorneys," and it became the duty of appellees to return the $5,-000. This under the plain terms of the contract between the parties. The abstract of title did not show a marketable title, and failed to connect appellees' title with the sovereignty of soil, and the amendments added nothing to the effectiveness of the original abstract of title.

The judgment is reversed, and judgment here rendered that appellant recover of appellees the sum of $5,000, with 6 per cent. interest thereon from July 19, 1926, time of filing of this suit, and for all costs of this and the lower court.

Reversed and rendered.